# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 17-750

**STEVE CROOKS AND ERA LEA CROOKS**

**VERSUS**

**STATE OF LA., DEPARTMENT OF NATURAL RESOURCES**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 224,262
HONORABLE JAMES HUGH BODDIE, JR., *Ad Hoc*

\*\*\*\*\*\*\*\*\*\*

**D. KENT SAVOIE**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of John D. Saunders, Marc T. Amy, and D. Kent Savoie, Judges.

**AFFIRMED IN PART; VACATED IN PART; AND RENDERED.**

**Amy, J., dissents and assigns reasons.**

**Ronald J. Fiorenza**
**Joseph J. Bailey**
**Provosty, Sadler, deLaunay, Fiorenza & Sobel**
**Post Office Box 1791**
**Alexandria, LA   71309-1791**
**(318) 445-3631**
**COUNSEL FOR DEFENDANT/APPELLANT:**
**State of Louisiana, Department of Natural Resources**

**Sean T. Porter**
**General Counsel, Division of Administration**
**Post Office Box 94095**
**Baton Rouge, LA   70804-9095**
**(225) 342-7154**
**COUNSEL FOR DEFENDANT/APPELLANT:**
**State of Louisiana, Department of Natural Resources**

**Michelle M. White**
**Assistant Attorney General**
**Post Office Box 94005**
**Baton Rouge, LA   70804-9005**
**(225) 326-6000**
**COUNSEL FOR DEFENDANT/APPELLANT:**
**State of Louisiana, Department of Natural Resources**

**Scott Johnson**
**Steven B. "Beaux" Jones**
**Harry J. Vorhoff**
**Ryan M. Seidemann**
**Assistant Attorneys General**
**1885 North Third Street**
**Baton Rouge, LA   70802**
**(225) 326-6085**
**COUNSEL FOR DEFENDANT/APPELLANT:**
**State of Louisiana, Department of Natural Resources**

**V. Russell Purvis, Jr.**
**Smith, Taliaferro & Purvis**
**Post Office Box 298**
**Jonesville, LA   71343**
**(318) 339-8526**
**COUNSEL FOR PLAINTIFFS/APPELLEES:**
**Steve Crooks**
**Era Lea Crooks**

**J. Rock Palermo, III**
**Veron, Bice, Palermo & Wilson, LLC**
**Post Office Box 2125**
**Lake Charles, LA   70602-2125**
**(337) 310-1600**
**COUNSEL FOR PLAINTIFFS/APPELLEES:**
     **Steve Crooks**
     **Era Lea Crooks**

**Christopher J. Piasecki**
**Davidson, Meaux, Sonnier, McElligott,**
**Fontenot, Gideon & Edwards**
**Post Office Box 2908**
**Lafayette, LA   70502-2908**
**(337) 237-1660**
**COUNSEL FOR PLAINTIFFS/APPELLEES:**
     **Steve Crooks**
     **Era Lea Crooks**

**Yolanda G. Martin**
**Daniel D. Henry, Jr.**
**Nicholas T. "Cole" Garrett**
**Louisiana Department of Wildlife & Fisheries**
**Post Office Box 98000**
**Baton Rouge, LA   70898-9000**
**(225) 765-2369**
**COUNSEL FOR AMICUS CURIAE:**
     **Louisiana Wildlife and Fisheries Commission**
     **Louisiana Department of Wildlife and Fisheries**

**Mark A. Begnaud**
**McCoy, Roberts & Begnaud, LTD.**
**Post Office Box 1369**
**Natchitoches, LA   71458**
**(318) 352-6495**
**COUNSEL FOR AMICUS CURIAE:**
     **Red River Waterway District**

**Mark D. Seghers**
**Seghers & Perez, LLC**
**2955 Ridgelake Drive, Suite 108**
**Metairie, LA   70002**
**(504) 810-5671**
**COUNSEL FOR AMICUS CURIAE:**
     **Backcountry Hunters & Anglers**

**SAVOIE, Judge.**

The Plaintiffs filed this class action lawsuit, seeking to be declared owners of certain immovable property and to fix the boundary between their properties and State-owned property. The Plaintiffs further requested compensation for the inverse condemnation of the immovable property and repayment of royalties received by the State for oil, gas, and mineral activities that have taken place on the property. The trial court rendered judgment in favor of the Plaintiffs, awarding compensation and attorney's fees, and the State now appeals. For the following reasons, we affirm in part, vacate in part and render judgment.

## FACTS AND PROCEDURAL HISTORY

In 1962, the United States began constructing various structures[1] in and around the Catahoula Basin pursuant to a congressionally-authorized navigation project under the River and Harbor Act of 1960[2] to promote navigation on the Ouachita and Black Rivers. In association with the project, the State of Louisiana and the United States signed an "Act of Assurances." Under the Act of Assurances, the State agreed to:

> a. Furnish free of cost to the United States all lands, easements, and rights of way, including flowage rights in overflow areas, and suitable spoil-disposal areas necessary for construction of the project and for its subsequent maintenance, when and as required;
>
> . . . .
>
> c. Hold and save the United States free from damages due to construction and maintenance of the project[.]

---

[1] These structures include the Jonesville Lock and Dam, Archie Weir on Little River, and the Catahoula Diversion Canal.

[2] The Act approved "the construction, repair, and preservation of certain public works on rivers and harbors for navigation, flood control, and for other purposes." River and Harbor Act of 1960, Pub. L. No. 86-645, § 101, 74 Stat. 480.

In connection with the project, the Catahoula Lake Water Level Management Agreement (hereinafter called the Water Level Management Agreement) was also developed and signed by the United States Army Corps of Engineers; the Bureau of Sport Fisheries and Wildlife, Fish and Wildlife Service, United States Department of the Interior; and the Louisiana Wildlife and Fisheries Commission. The agencies confected the agreement to ensure that proper water level management would protect the wildlife and public recreational opportunities in the Catahoula Basin, including an area known as Catahoula Lake. Upon completion of the project in 1972, the record indicates that the United States Fish and Wildlife Service began managing water levels in and around the Catahoula Basin in accordance with a seasonal schedule outlined in the agreement. As intended, these water management activities increased water levels in the Catahoula Basin and prolonged the natural annual high-water fluctuations. The record indicates that the United States Fish and Wildlife Service continues to manage the water levels in the Catahoula Basin to this day. Further, the record indicates that the State exercises jurisdiction of the Louisiana Department of Wildlife and Fisheries and has granted mineral leases in the area known as Catahoula Lake.

On May 4, 2006, Steve Crooks and Era Lea Crooks filed a "Class Action Petition To Fix Boundary, For Damages And For Declaration Judgment." They alleged to be representatives of a class of landowners in the Catahoula Basin whose property is affected by the increased water levels from the project. The trial court ultimately certified the Plaintiffs as one class (hereinafter collectively referred to as "Plaintiffs"). However, the trial court ascertained that the resolution of some members' claims would require determining ownership of certain lands. Accordingly, the trial court subdivided the Plaintiff class into two distinct groups

2

depending upon the locations of their properties. The trial court referred to the groups as the "Lake Plaintiffs" and the "Swamp Plaintiffs" and summarized their claims as follows:

> The Lake Plaintiffs are seeking to have all lands between the ordinary low and ordinary high water mark of the Little River within the area known as Catahoula Lake to be declared owned by the class in accordance with Louisiana's laws of riparian ownership. . . . The Lake Plaintiffs have asserted additional claims seeking[:] a declaration that their lands have been unlawfully expropriated, without compensation, due to the significant obstructions to the natural drainage in and around the Catahoula Basin caused by the [project]; damages for the unlawful taking of their land because of this inverse condemnation; and to recover the mineral royalty and other payments derived from oil, gas, and mineral activities and productions received by the State of Louisiana from the immovable property that is the subject of these proceedings.

> Separate and independent from the above, the Swamp Plaintiffs consists [sic] of the owners of "overflow lands" located in the southwestern portion of the Catahoula Basin. Much of the land bordering and lying outside Catahoula Lake was selected and approved as swampland and transferred to the state by the United States Government under the Swampland Acts of 1849 and 1850. It is not disputed that these lands are below an elevation of 36 feet mean sea level, and that their titles originated from patents issued by the [S]tate. Because of the State's acknowledgment that these plaintiffs' ownership is not disputed,[3] the only remaining issues with respect to these owners is whether the overflow lands have been unlawfully expropriated and, if so, the amount of damages necessary to compensate these plaintiffs for the unlawful taking of their land without compensation.

---

[3] The parties entered a pre-trial stipulation resolving the Swamp Plaintiffs' ownership. Previously, the State acknowledged the Swamp Plaintiffs' ownership claims in a reconventional demand filed on December 11, 2013, which stated, in pertinent part:

> [T]he State avers that Catahoula Lake is a public thing, as defined by the Louisiana Civil Code art. 450, and is therefore owned by the State. As to the Plaintiff Class, the State asserts full ownership of Catahoula Lake up to the ordinary high-water mark of said body of water. The State further avers that notwithstanding said claim, the swamp and overflow lands located in Rapides, Grant, and LaSalle Parishes, which were conveyed to the State of Louisiana by the United States government under the Swamplands Act of 1849, are not deemed to be part of or within the boundary of Catahoula Lake, and are not claimed by the State herein.

The Lake Plaintiffs argued that, though referred to as a lake, the area known as Catahoula Lake actually constitutes the banks of a body of water in the Catahoula Basin called Little River and thus is owned by the Lake Plaintiffs in accordance with Louisiana's laws of riparian ownership.[4] They asserted that, prior to construction of the project and management of the water levels in the Catahoula Basin, Little River crossed the Catahoula Basin and seasonally overflowed its banks. They argued that, during overflow periods, Little River expanded across the entire Catahoula Basin and was mistakenly called Catahoula Lake. Thus, as detailed in the above quote, the Lake Plaintiffs sought to be declared owners of the area between the ordinary low water mark and the ordinary high water mark of Little River.[5]

In response, the State filed a motion for partial summary judgment. In the motion, the State asserted that the third circuit made a legal determination in *Sanders v. State, Dep't of Natural Res.*, 07-821 (La.App. 3 Cir. 12/19/07), 973 So.2d 879, *writ denied*, 08-0438 (La. 4/18/08), 978 So.2d 352, that the area known as Catahoula Lake is, as a matter of law, a navigable lake as defined in the Louisiana Civil Code. Accordingly, the State asserted that the area known as Catahoula Lake is owned, as a matter of law, by the State, not the Plaintiffs.[6] The trial court granted the State's

---

[4] *See, e.g.,* La.Civ.Code art. 456, which provides, in pertinent part:

> The banks of navigable rivers or streams are private things that are subject to public use.

> The bank of a navigable river or stream is the land lying between the ordinary low and the ordinary high stage of the water.

[5] We note that the parties did not dispute that the State owns the bed of Little River, that is, the land lying between the ordinary low water mark of the water on the one side and the ordinary low water mark of the water on the other side.

[6] Louisiana Civil Code Article 450 provides, in pertinent part, that "[p]ublic things that belong to the state are such as . . . the waters and bottoms of natural navigable water bodies[.]" *See also State v. Placid Oil Co.*, 300 So.2d 154 (La.1973).

4

motion, and the Plaintiffs appealed. On appeal, a panel of this court reversed the grant of summary judgment, noting that the fundamental question of whether the area known as Catahoula Lake is a lake or a river was not an adjudicated issue in *Sanders*, 973 So.2d 879. *Crooks v. State, Dep't of Natural Res.*, 11-920 (La.App. 3 Cir. 12/7/11), 81 So.3d 47.

Accordingly, the parties continued to litigate how to classify the area known as Catahoula Lake. The parties focused on the status of the area as of April 30, 1812, the year Louisiana entered the Union.[7] The Plaintiffs argued that, in 1812, the area known as Catahoula Lake was merely the seasonal overflow of Little River. In contrast, the State argued that, in 1812, the area known as Catahoula Lake was a distinct lake bed that experienced seasonal variations in water level. The State ultimately filed a reconventional demand, which stated, in pertinent part:

Wherefore, the State, as plaintiff-in-reconvention:

---

[7] In written reasons for judgment, the trial judge noted: "Everyone recognizes that April 30, 1812, the date Louisiana became a state, determines whether the body of water in the Catahoula Basin should be classified as a river, or a lake." This focus on the date Louisiana became a state was based upon the equal footing doctrine. Upon their admission to the Union and in their sovereign capacity, states acquired title to the beds of navigable waters according to the equal footing doctrine, which was explained on rehearing by the supreme court in *Gulf Oil Corp. v. State Mineral Bd.*, 317 So.2d 576, 589 (La.1974):

> The right of ownership of navigable water bottoms was vested in the State of Louisiana upon its admission into the Union in 1812 on an equal footing with the original thirteen states. See Shively v. Bowlby, 152 U.S. 1, 14 S.Ct. 548, 38 L.Ed. 331 (1894); Johnson v. McIntosh, 21 U.S. (8 Wheat.) 543, 5 L.Ed. 681 (1823); Illinois Central Ry. v. Illinois, 146 U.S. 387, 13 S.Ct. 110, 36 L.Ed. 1018 (1892); Weber v. Board of State Harbor Commissioners, 85 U.S. (18 Wall.) 57, 21 L.Ed. 798 (1873); Pollard's Lessee v. Hagan, 44 U.S. (3 How.) 212, 11 L.Ed. 565 (1845). The United States Supreme Court held in Martin v. Waddell, 41 U.S. (16 Pet.) 367, 10 L.Ed. 997 (1842) that after the Revolution, the people of each state themselves became sovereign, and in that character hold title to all navigable waters and their beds for their own common use, subject only to the supremacy of the federal government. This proposition has been restated in the recent case of Bonelli Cattle Company v. Arizona, 414 U.S. 313, 94 S.Ct. 517, 38 L.Ed.2d 526 (1973). Because of the equal footing doctrine, states subsequently admitted to the Union likewise acquired the beds of navigable waters, but only in the capacity of trustee for the interest of the people of the state.

. . . .

> 2) Prays that after due proceedings be had there be judgment in favor of plaintiff-in-reconvention, the State of Louisiana, and against defendants-in-reconvention, the Plaintiff Class, recognizing that Catahoula Lake is a lake and the State owns the bed and waters below the ordinary high water mark and dismissing all claims asserted by the Plaintiff Class/defendants in reconvention at their cost[.]

As an alternative to its merits argument that the area known as Catahoula Lake was, as a matter of law, a lake in 1812, the State filed a peremptory exception of no right of action, which was referred to the merits. The State alleged that the Plaintiffs do not have a direct right of action against the State for any inverse condemnation actions for which the United States may be responsible because the Act of Assurances is not a third-party beneficiary contract (also referred to as a *stipulation pour autrui*"[8]). Under the exception, the State also argued that "[u]nder long-standing United States Supreme Court jurisprudence a right of action for just compensation for a taking by the United States only inures to those persons owning a parcel at the time it was taken." The State claimed that because the Plaintiffs had failed to demonstrate their ownership at the time of the inverse condemnation, which the State alleged had occurred in 1972 upon completion of the project when the United States Fish and Wildlife Service began to manage the water levels in the Catahoula Basin, they lacked a right of action to proceed.

As another alternative to its merits argument that the area known as Catahoula Lake was, as a matter of law, a lake in 1812, the State also filed a peremptory

---

[8] Louisiana Civil Code Article 1978 recognizes third party beneficiary contracts, providing, in pertinent part, that "[a] contracting party may stipulate a benefit for a third person called a third party beneficiary." *See also* La.Civ.Code arts. 1979-1982. Though the Louisiana Civil Code does not employ the phrase, a contract that provides a benefit to a third party is commonly known as a "*stipulation pour autrui*." *Joseph v. Hospital Serv. Dist. No. 2 of Parish of St. Mary*, 05-2364 (La. 10/15/06), 939 So.2d 1206.

exception based on liberative prescription prior to trial. According to the record, the peremptory exception of liberative prescription was also referred to the merits by agreement of the parties and the trial court in lieu of a separate hearing. The State argued that, even if the Lake Plaintiffs were the legal owners of the area known as Catahoula Lake, both the Lake Plaintiffs' and the Swamp Plaintiffs' claims were prescribed based on 28 U.S.C.A. § 2501.[9] Alternatively, the State asserted that the Plaintiffs' claims were prescribed based on the prescriptive periods found in either La.R.S. 13:5111[10] or the pre-revision version of La.R.S. 9:5624.[11]

After a bench trial on the merits, the trial court issued written reasons for judgment and provided the following description of the Catahoula Basin, the area known as Catahoula Lake, and Little River (alteration in original):

> The unique characteristics of Catahoula Lake and indeed the Basin itself cannot be overemphasized since it is truly a "one of a kind," geographic area. The Catahoula Basin is an area of very flat land located in the parishes of Rapides, Grant, and LaSalle that forms a platter extending outward from the channel of Little River. Because of the unusual topography of the basin, the slope of the river's bank is extremely gradual. A description of Catahoula Lake can be found in the "Catahoula Lake Area Report" presented to

---

[9] In pertinent part, 28 U.S.C.A. § 2501 declares that "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues."

[10] Louisiana Revised Statutes 13:5111 is entitled "Appropriation of property by state, parish, municipality or agencies thereof; attorney, engineering and appraisal fees; prescription." In pertinent part, La.R.S. 13:5111 provides that "[a]ctions for compensation for property taken by the state, a parish, municipality or other political subdivision or any one of their respective agencies shall prescribe three years from the date of such taking."

[11] Before a revision in 1987 (*see* 1987 La. Acts No. 339, § 1), La.R.S. 9:5624 stated: "When private property is damaged for public purposes any and all actions for such damages are prescribed by the prescription of two years, which shall begin to run when the damages are sustained."

After the revision, and in its current form, La.R.S. 9:5624 reads: "When private property is damaged for public purposes any and all actions for such damages are prescribed by the prescription of two years, which shall begin to run after the completion and acceptance of the public works."

Governor Kennon and the Louisiana Legislature by the Louisiana Department of Public Works in 1954:

> The lake bed proper has a length of about 14 miles and an average width of 3 miles covering an area of some 42 square miles or about 27,000 acres. The western Louisiana uplands adjoin the lake bed on the west and northwest. To the south and southeast of the lake bed lies alluvial area. The lowest portion of the lake's bed of any appreciable extent is at elevation 27 feet m.s.l.… The principal tributary to the lake is Little River which enters the lake at its southwest end. It traverses the lake in a relatively wide and shallow channel to the northeast end of the lake, a total distance of about 15 miles. Outflow from the lake is principally through French Fork and Old River which join at Lavaca forming Little River down which the flow is carried to Black River at Jonesville. One other principal outlet or distributary of the lake, which serves mostly for flood flows, is Big Saline Bayou which emerges from the lake near its southwest end meandering southeasterly to join Red River. Other outlets for flood waters are Sandy, Indian, Muddy, Cypress and Big Bayous, all of which lead off in a southeastern direction through either Saline Lake or Larto Lake to Red River.

> . . . .

> A watershed area of 2,672 square miles contributes to the lake. The area is composed principally of upland hilly timbered area and extends generally northwestward from the lake to Ruston and the vicinity of Arcadia, an airline distance of some 80 miles with an average width of about 33 miles. Little River drains an area of 2,555 square miles above its entry into the lake.

Ultimately, the trial court found in favor of the Plaintiffs. First, the trial court concluded that, in 1812, the area known as Catahoula Lake constituted the banks of Little River. Therefore, the trial court declared the Lake Plaintiffs to be the owners of the area known as Catahoula Lake according to Louisiana's laws of riparian ownership. In turn, the trial court further held that the Lake Plaintiffs are entitled to

the royalties received by the State for oil, gas, and mineral activities that took place in the area known as Catahoula Lake between May 2003 and the date of trial.[12]

In deciding the exception of no right of action, the trial court found that the United States is the party that inversely condemned the Plaintiffs' lands. The trial court stated that the Act of Assurances signifies an agreement by which the State became an indemnifier of the United States, and the trial court further concluded that the Plaintiffs could bring their inverse condemnation claims directly against the State because the Plaintiffs are third party beneficiaries of the Act of Assurances, which, the trial court reasoned, constitutes a *stipulation pour autrui*. The trial court also addressed the State's argument that "a right of action for just compensation for a taking by the United States only inures to those persons owning a parcel at the time it was taken." The trial court acknowledged that only one Plaintiff demonstrated ownership prior to 1973, which is the year after the project was completed and the Water Level Management Agreement was implemented. Nonetheless, citing *Eagle Pipe & Supply, Inc. v. Amerada Hess Corp.*, 10-2267, 10-2272, 10-2275, 10-2279,

---

[12] In written reasons for judgment, the trial court explained: "It is not disputed that the plaintiffs are only seeking to recover the royalties attributable to these leases during the three years before suit was filed as well as royalties to the present." In their First Supplemental and Amending Class Action Petition, the Lake Plaintiffs stated:

> The plaintiff class has made a claim for any royalty payments or associated payments paid to the defendant three years prior to the filing of this proceeding and thereafter during the pendency of this proceeding. As provided under Louisiana law, in the event that in the first part of this bifurcated proceeding it is determined that the water body located in the Catahoula Basin is a river or stream rather than a lake, it is respectfully submitted that the defendant be ordered to make a full accounting of all royalty payments or associated payments it has received from a three year period prior to the filing of the proceeding up and until the rendition of such a determination.[]

Though not specifically cited by the Lake Plaintiffs in their First Supplemental and Amending Class Action Petition, regarding the Lake Plaintiffs' request, the State pointed out in its post-trial memorandum to the trial court that La.Civ.Code art. 3494 provides, in pertinent part, that a liberative prescription of three years applies to "[a]n action to recover underpayments or overpayments of royalties from the production of minerals."

10-2289 (La. 10/25/11), 79 So.3d 246, the trial court concluded that a subsequent purchaser can assert a right of action when, as "in the case *sub judice*, there is obviously continuing, persistent, and ongoing tortious acts creating a continuing tort." Thus, the trial court denied the State's exception of no right of action.

In deciding the State's exception of liberative prescription, the trial court concluded that La.R.S. 9:5624, which provides a two-year prescriptive period to bring an action when private property is damaged for public purposes, was inapplicable to the case. The court found compelling the case of *Roberson v. Lincoln Parish Police Jury*, 39,418 (La.App. 2 Cir. 3/23/05), 899 So.2d 636, wherein the second circuit found that injunctive relief for the natural servitude of drain did not prescribe. Next, the trial court concluded that the three-year prescriptive period found in La.R.S. 13:5111 was inapplicable. Citing *Cooper v. Louisiana Dep't of Pub. Works*, 03-1074 (La.App. 3 Cir. 3/3/04), 870 So.2d 315, the trial court indicated that La.R.S. 13:5111 only applies when property is taken by the State and concluded, based on the facts of this case, that the property in this case was damaged by the United States.[13]

---

[13] In written reasons for judgment, the trial court quoted the following passage from *Cooper*, 870 So.2d 315, 324 (internal footnotes omitted):

> The court cannot supply the objection of prescription; a party must plead it. The party pleading prescription has the burden of proving that the claim had prescribed. We must strictly construe prescriptive statutes against prescription and in favor of the obligation that a party seeks to have extinguished. Therefore, when there are two possible constructions, we should adopt the construction that favors maintaining, as opposed to barring, an action.
>
> A strict reading of La.R.S. 13:5111 leaves one no choice but to conclude that the three-year prescriptive period should only apply when it is "the state, a parish, municipality, or other political subdivision or any one of their respective agencies" taking the property. Even if we had any doubt whether this language encompassed takings by the United States, we could not alter our conclusion, given the mandate that we strictly construe ambiguous prescription statutes against prescription and in favor of the obligation sought to be extinguished.

The trial court eventually concluded that the relevant prescriptive period is the one-year period for a claim involving damage to immovable property as found in La.Civ.Code art. 3493 and further found that there is no prescriptive period for the injunctive relief for the natural servitude of drain.[14] However, despite concluding that the Plaintiffs were aware or should have been aware of the increased inundation no later than 1973,[15] the trial court further determined that the one-year prescriptive period had not begun to run on the Plaintiffs' claims in 1973 because the "increased duration of the flooding of [the Plaintiffs'] lands constitutes continuing tortious conduct." The trial court cited *Cooper*, 870 So.2d 315, and discussed the continuing tort doctrine, noting: "The continuing tort doctrine recognizes that in some instances, there is no single wrongful act that 'causes' the damage. Instead, there are continuous or repeated wrongful acts, each of which creates a new harm. Until those wrongful acts cease, prescription does not run." Thus, the trial court concluded that the Plaintiffs' inverse condemnation claims had not prescribed according to the continuing tort doctrine, and the trial court held that the Plaintiffs were entitled to an inverse condemnation award.

The trial court summarized its holdings as follows:

(1) the body of water in the Catahoula Basin in 1812 was a permanent river that seasonally overflowed and covered its banks; (2) the riparian owners ("Lake Plaintiffs") are the legal owners of these river banks; (3) the state is legally responsible and liable for the wrongful expropriation (inverse condemnation) of the plaintiffs' lands because of the significant obstruction of the natural servitude of drainage; (4) these expropriation damages total $28,745,438.40

---

[14] Louisiana Civil Code Article 3493 provides: "When damage is caused to immovable property, the one year prescription commences to run from the day the owner of the immovable acquired, or should have acquired, knowledge of the damage."

[15] In written reasons for judgment, the trial court stated that "the complaining property owners or their ancestors in title were aware or should have been aware of the increased inundation of their lands no later than 1973."

11

(i.e., 22,813.84 acres multiplied by $1,260 per acre) for the riparian landowners, and $9,550,800 (i.e., 7,580 acres multiplied by $1,260 per acre) for the owners of the overflow lands ("Swamp Plaintiffs"), all subject to legal interest from the date of judicial demand until paid; and (5) the riparian landowners are entitled to a total award of $4,694,309.68 together with legal interest from the date of judicial demand until paid, which sum represents the oil and gas royalties attributable to the mineral production from these river banks between May of 2003 and the date of trial.

Thereafter, the trial court also awarded attorney fees totaling $22,075,843.77. The trial court held that seventy-five percent (75%) of the total award ($16,556,882.82) shall qualify and be assessed against the State pursuant to La.R.S. 13:5111(A),[16] while twenty-five percent (25%) of the total award ($5,518,960.95) shall qualify and be assessed against the common fund pursuant to La.Code Civ.P. art. 595.[17] Additionally, the trial court awarded to the Plaintiffs $353,297.34 for the reimbursement of the Plaintiffs' expert witness fees; $89,067.45 for the reimbursement of other miscellaneous costs incurred; and $168,000.00 as a provisional amount for the administration of the claims process post-trial. The trial court further awarded $10,000.00 as a class representative incentive award to Mr. Crooks. The trial court similarly divided these awards, assessing seventy-five

---

[16] In pertinent part, La.R.S. 13:5111(A) provides:

A court of Louisiana rendering a judgment for the plaintiff, in a proceeding brought against the state of Louisiana, a parish, or municipality or other political subdivision or an agency of any of them, for compensation for the taking of property by the defendant, other than through an expropriation proceeding, shall determine and award to the plaintiff, as a part of the costs of court, such sum as will, in the opinion of the court, compensate for reasonable attorney fees actually incurred because of such proceeding.

[17] Louisiana Code of Civil Procedure Article 595(A) provides:

The court may allow the representative parties their reasonable expenses of litigation, including attorney's fees, when as a result of the class action a fund is made available, or a recovery or compromise is had which is beneficial, to the class.

percent (75%) of each total award against the State and twenty-five percent (25%) against the common fund.

The State appeals, asserting as error that:

1. The district court erred in determining that Catahoula Lake is not a lake.

> a. The district court erred in not finding that, under Louisiana law, a lake can be seasonally dry and still qualify as a lake.

> b. The district court erred in its application of the multi-factor test established by the Louisiana Supreme Court in *State v. Placid Oil Co.*, 300 So.2d 154 (La.1974), *cert. denied*, 419 U.S. 1110 (1975), for determining whether a body of water is a river or a lake.

2. The district court erred in finding that the Appellees have the right to assert a takings claim against the State.

> a. The district court erred in finding that the "Act of Assurances" between the United States and the State constitutes a *stipulation pour autrui*.

> b. The district court erred in finding that Appellees who purchased their properties after 1973 could assert a taking claim for actions occurring before 1973.

3. The district court erred in finding that prescription on the Appellees' takings claims did not begin to run in 1973 when they became aware of the permanent flooding of their respective properties.

> a. The district court erred in applying tort doctrine to an appropriation claim.

> b. In the alternative, if the application of tort doctrine is appropriate, the district court erred in finding that the increased water level resulting from the construction and maintenance of the Project is a continuing tort.

4. The district court erred in its measure of damages and attorney's fees.

> a. The district court erred in awarding damages for the taking of property belonging to non-class riparian landowners.

13

b. The district court erred in not setting the location of the ordinary low water mark to accurately determine the size of the allegedly taken property.

c. The district court committed legal error by valuing the allegedly taken property at the time the Appellees' [sic] filed their petition and not at the time of the alleged taking.

d. The district court erred in employing an unsupportable methodology for determining reasonable attorney's fees, which resulted in an award of over $16.6 million.

On appeal, the State has also filed exceptions of lack of subject matter jurisdiction, no right of action, nonjoinder, and acquisitive prescription.

## DISCUSSION

*Exception of Lack of Subject Matter Jurisdiction on Appeal*

On appeal, the State has asserted an exception of lack of subject matter jurisdiction. The State alleges that the trial court's final judgment lacks the necessary decretal language to qualify as a final judgment, such that this court never acquired subject matter jurisdiction over the matter. In particular, the State contends that the trial court's judgment fails to name the plaintiffs with particularity, instead referencing their property locations on maps and referring to them as the "Lake Plaintiffs" and the "Swamp Plaintiffs." The State also alleges that the judgment lacks the necessary decretal language because it does not provide a clear directive as to the allocation of the monetary awards to the individual parties. Rather, as the State points out, the judgment generally awards $9,550,800.00 to the Swamp Plaintiffs and $28,745,438.40 and $4,694,309.68 for the inverse condemnation and royalties claims, respectively, to the Lake Plaintiffs. Lastly, the State argues that the judgment lacks the necessary decretal language because it does not describe the immovable property with particularity.

14

According to La.Code Civ.P. art. 1918, "[a] final judgment shall be identified as such by appropriate language." As a panel of this court has explained, "[u]nless appellate jurisdiction is properly invoked by a valid final judgment, the appellate court cannot determine the merits of an appeal." *Goal Properties, Inc. v. Prestridge*, 14-422, p. 3 (La.App. 3 Cir. 11/5/14), 150 So.3d 610, 613.

The State's first argument that the final judgment does not contain sufficient decretal language relates to the description of the Plaintiffs. In the judgment, the trial court referenced the Plaintiffs as the "Lake Plaintiffs" and the "Swamp Plaintiffs" and referred to a map attached as part of the judgment, which lists the Plaintiffs' names according to the locations of their properties. In *Goal Properties, Inc.*, 150 So.3d at 613, a panel of this court explained:

> In order to constitute a final appealable judgment, the "judgment must contain decretal language, and it must name the party in favor of whom the ruling is ordered, the party against whom the ruling is ordered, and the relief that is granted or denied." *Frank v. City of Eunice*, 13–1118, p. 3 (La.App. 3 Cir. 3/5/14), 134 So.3d 222, 225. These requirements should be evident without reference to other documents in the record. *Id.*

Here, the specific names of the Plaintiffs are included on the map, and the map is a part of the final judgment. Accordingly, the names of the parties are discernable without reference to extrinsic documents or pleadings. *See Vanderbrook v. Coachmen Indus., Inc.*, 01–809 (La.App. 1st Cir. 5/10/02), 818 So.2d 906.

In its next argument, the State alleges that the judgment lacks the necessary decretal language because it does not provide a clear directive as to the allocation of the monetary awards to the individual parties. The trial court's judgment awarded, on a price per acre basis, $28,745,438.40 and $4,694,309.68 to the Lake Plaintiffs for the alleged inverse condemnation and mineral interests, respectively, and $9,550,800.00 to the Swamp Plaintiffs for the alleged inverse condemnation. We

find this contains a sufficiently clear directive regarding the allocation of the monetary awards.

The State's last argument relates to the description of the property. Louisiana Code of Civil Procedure Article 1919 provides, in pertinent part: "All final judgments which affect title to immovable property shall describe the immovable property affected with particularity." *See also* La.Code Civ.P. art. 2089.[18] In the final judgment, the trial court described the land that the trial court concluded is owned by the Lake Plaintiffs as:

> [T]he river banks in the Catahoula Basin consisting of 22,813,84 acres of lands located between the ordinary low water mark of the Little River and the ordinary high water mark of 36 feet mean sea level of the Little River, which lands are depicted in light blue and referred to as the bed and bottom of the so-called "Catahoula Lake" on the State's exhibit introduced into evidence and identified as FW 202, a copy of which is attached hereto and made part of this final judgment.

Further, the trial court described the Swamp Plaintiffs' property as:

> [T]he 7,580 acres of land patented by the State of Louisiana in the southwestern portion of the Catahoula Basin, which lands are identified as property listing nos. 29 through 83, and as the lands owned by W.H. Ward Properties, Inc., on the State's exhibit introduced into evidence and identified as FW 202, a copy of which is attached hereto and made part of this final judgment.

We find this constitutes a sufficient property description for jurisdictional purposes.

Accordingly, the State's exception of lack of subject matter jurisdiction is denied.

*Ownership of the Area Known as Catahoula Lake*

As discussed above, the trial court held that, at the time Louisiana entered the Union in 1812, the area known as Catahoula Lake was a permanent river that

---

[18] Louisiana Code of Civil Procedure Article 2089 states: "All judgments and decrees which affect title to immovable property shall describe with particularity the immovable property affected."

seasonally overflowed and covered its banks. From this holding, the trial court next held that the Lake Plaintiffs are the legal owners of these river banks based on Louisiana's laws of riparian ownership. *See, e.g.,* La.Civ.Code art. 456. The State asserts that the trial court erred in finding that the area known as Catahoula Lake is not a lake. As alternative arguments, the State has filed an exception of no right of action and a peremptory exception of acquisitive prescription pursuant to La.Code Civ.P. art. 927 on appeal prior to submission of the case for decision.

In the exception of no right of action asserted on appeal, the State argues that even if the Lake Plaintiffs are the owners of the area known as Catahoula Lake, they do not have the requisite property interest to bring an inverse condemnation claim. In particular, the State explains that, because this is a federal navigation project that was constructed and is still maintained by the United States, the United States has a flowage servitude over the property below the ordinary high water mark by virtue of the federal navigation servitude. In opposition, the Lake Plaintiffs argue, in part, that the definition of ordinary high water mark for the federal navigation servitude is not the same as the definition of ordinary high water mark under Louisiana law. They further note that there is no evidence in the record to prove the location of the alleged federal high water mark.

According to La.Code Civ.P. art. 2163, an "appellate court may consider the peremptory exception filed for the first time in that court, if pleaded prior to a submission of the case for a decision, and if proof of the ground of the exception appears of record." Thus, we preliminarily determine whether proof of the ground of the State's exception of no right of action appears in the record. In *DeSambourg v. Bd. of Comm'rs for Grand Prairie Levee Dist.*, 621 So.2d 602, 612 (La.1993)

17

(footnote omitted), *cert. denied*, 510 U.S. 1093, 114 S.Ct. 925 (1994), the supreme court explained:

> The laws and jurisprudence of . . . the United States are irrelevant to the quest for the meaning of ordinary high water in relation to the levee servitude and the rights of riparian landowners in Louisiana. *State v. Richardson*, [140 La. 329,] 72 So. [984,] 987 [(1916)]. . . . Louisiana is not bound to indiscriminately follow a federal or common law definition of ordinary high water which has no connection to our definition of batture, the levee servitude or riparian landowner rights, as set forth in our Constitution, legislation and jurisprudence.

Considering the foregoing, we agree with the Lake Plaintiffs that the location of the ordinary high-water mark under federal law cannot be determined by reference to the location of the ordinary high-water mark under Louisiana law. *See also Parm v. Shumate*, 513 F.3d 135, 143 n.4 (5th Cir. 2007) (noting that "Louisiana has rejected the federal definition of high water mark and relies, instead, on the ordinary seasonal flood levels"), *cert. denied*, 555 U.S. 813, 129 S.Ct. 42 (2008). Because there is no proof in the record of the location of the alleged federal high water mark, we have not considered the merits of the State's exception. *See* La.Code Civ.P. art. 2163.

We next address the State's exception of prescription because "[t]he function of the peremptory exception is to have the plaintiff's action declared legally nonexistent, or barred by effect of law, and hence this exception tends to dismiss or defeat the action." La.Code Civ.P. art. 923. Preliminarily, we note that the peremptory exception of prescription in La.Code Civ.P. art. 927(A)(1) includes both acquisitive and liberative prescription. *Montgomery v. Breaux*, 297 So.2d 185 (La.1974). The exception of prescription can be filed for the first time in the appellate court if it is formally pleaded prior to submission of the case for decision. *Willett v. Premier Bank*, 97-187 (La.App. 3 Cir. 6/4/97), 696 So.2d 196.

We first turn to the parties' arguments regarding the matter of acquisitive prescription. The State asserts that even if the trial court was correct in finding that the area under consideration is not a lake, the Lake Plaintiffs have lost ownership of the land to the State by virtue of thirty-year acquisitive prescription. The State contends that the State has corporeally possessed the area known as Catahoula Lake since the early 1970s when State-owned navigable waters were artificially modified by the project. Further, the State notes that since at least the mid-nineteenth century, the State has believed that it owned the land and has acted accordingly by granting mineral leases and exercising the jurisdiction of the Louisiana Department of Wildlife and Fisheries over the area.

In opposition to the State's exception, the Lake Plaintiffs argue that the State is prohibited by the Louisiana Constitution of 1974 from acquiring private property through acquisitive prescription. In this regard, the Lake Plaintiffs cite to La.Const. art. 1, § 4(B), which reads, in pertinent part: "Property shall not be taken or damaged by the state or its political subdivisions except for public purposes and with just compensation paid to the owner or into court for his benefit." The Lake Plaintiffs also cite to La.Const. art. 6, § 23, which provides that "political subdivisions may acquire property for any public purpose by purchase, donation, expropriation, exchange, or otherwise." The Lake Plaintiffs note that in interpreting the latter constitutional provision, the courts have held that "otherwise" does not include the right to acquire property through acquisitive prescription. The State responds that La.Const. art. 6, § 23, as well as the cases cited by the Lake Plaintiffs, apply only to political subdivisions of the State, not the State itself. The State contends that there is no jurisprudential, statutory, or constitutional prohibition on the State's acquisition of land by acquisitive prescription.

19

We consider the Lake Plaintiffs' argument that La.Const. art. 6, § 23, as well as the cases interpreting that provision, prevent the State from acquiring property by acquisitive prescription. In *Parish of Jefferson v. Bonnabel Properties, Inc.*, 620 So.2d 1168, 1171 (La.1993), the supreme court held that "it would be incorrect to conclude the constitutional framers, by the inclusion of the words 'or otherwise' in Article VI, Sect. 23, intended to allow political subdivisions to acquire full ownership of property through acquisitive prescription." *See also Roy v. Belt*, 03-1022 (La.App. 3 Cir. 2/18/04), 868 So.2d 209, *writ denied*, 04-1149 (La. 7/2/04), 877 So.2d 147 (holding that neither a sheriff nor his predecessor in title, the police jury, can acquire property by acquisitive prescription); and *King's Farm, Inc. v. Concordia Parish Police Jury*, 97-1056 (La.App. 3 Cir. 3/6/98), 709 So.2d 953, *writ denied*, 98-1450 (La. 9/18/98), 724 So.2d 748 (holding that a policy jury cannot acquire property through acquisitive prescription). Based on the foregoing, the cases cited by the Lake Plaintiffs indicate that a political subdivision of the State cannot acquire property through acquisitive prescription.

Regarding whether the State itself can acquire property through acquisitive prescription, we agree with the Lake Plaintiffs and find that we are bound by the language in Louisiana Constitution Article 1, § 4(B)(1). Applying this language to the present case, we find that acquisitive prescription is implicitly prohibited by the State because it is a taking without just compensation. The State's exception of acquisitive prescription is denied.[19]

We now move on to the State's argument that the trial court erred in finding that, in 1812, the area known as Catahoula Lake was a permanent river that

---

[19] We note that this result seems fair in light of the fact that acquisitive prescription does not run against the State. *See* La.Const. art. 12, § 13.

seasonally overflowed and covered its banks. The trial court made the following factual conclusions on this issue:

> A summary of the entirety of the evidence introduced at trial conclusively established, confirmed and reaffirmed the following inescapable conclusions, to-wit: (1) that the Little River channel in 1812 completely traversed the entire Catahoula Basin; (2) that Little River was a permanent, as opposed to a temporary body of water: (3) that during the wet season, Little River would seasonally overflow its channel and cover the surrounding low-lands in the Catahoula Basin; and (4) that annually at other times of the year, these low-lands were totally dry and clothed in luxuriant vegetation. Therefore, in 1812, there was only one permanent body of water, Little River, in the Catahoula Basin whose waters seasonally overflowed its channel and covered its banks, the extensive adjacent low-lying lands.

The trial court determined that "a temporary water body created when a river seasonally overflows its channel or a temporary body of water cannot qualify as a lake."

> In reaching that outcome, the trial court found:

> The court was faced with widely divergent views among the plaintiffs' and defendant's experts on the determinative issue in this case, that is, whether the so-called Catahoula Lake is a river or a lake. The significance of the historical evidence cannot be overstated for a proper analysis of that evidence is critical for the proper determination of the issue at hand. With that in mind, a careful analysis of the expert testimony offered in this case, together with the entirety of the evidence, causes the court to arrive at the following conclusions as to certain experts.

> A complete and thorough analysis of the evidence dictates the court's conclusion that the testimonies of plaintiffs' expert witnesses, Dr. Suhayda and Dr. Flowers, are credible, reliable, based on sound methodology, and much more persuasive with regard to the ultimate opinion in this case. For the reasons assigned herein, the court has credited their testimonies over that of Dr. Willis.

Dr. Joseph Suhayda was tendered and accepted as an expert in hydrology, including the movement of water and flooding, who spent thirty years as a professor at Louisiana State University. He testified that the hydraulic characteristics of a certain body of water determine its classification as a river or lake. Dr. Suhayda

further testified that the historical records provide the best evidence about a body of water's hydraulic characteristics in 1812. Dr. Suhayda concluded that, based on his extensive review of the historical records, the area at issue was a river.

Next, Dr. George Flowers testified. He was tendered and accepted as an expert in the fields of geology, geography, and hydrogeology. Dr. Flowers also relied on historical records for his opinions and reached the same conclusion. Specifically, he testified that, based upon the definition of a lake from the Glossary of Geology, "a lake is a standing body of water." He stated that Catahoula Lake is not a permanent body of water "because it drains." Dr. Flowers also testified that, after a review of the historical records, "it became clear that early on, extending into the 20th Century, there was an opinion that was repeated over and over again that the water body in the Catahoula Basin was indeed a river."

The State argues that the trial court erred by ignoring the historical documentation recognizing the water body in the Catahoula Basin as a "lake." The Lake Plaintiffs counter that "the overwhelming trial evidence confirmed it would be bad science to determine the classification of a water body based on its name."

The trial court relied on *Schoeffler v. Drake Hunting Club*, 05-499 (La.App. 3 Cir. 4/1/06), 919 So.2d 822. In *Schoeffler*, members of the general public filed a declaratory action seeking to fix the boundary between the state-owned bed of a navigable river and the privately owned banks. The case was dismissed on exceptions of no cause of action and no right of action. The third circuit affirmed, finding persons who hunt and fish on land that is inundated by waterways belonging to the State do not have a right of action to fix boundaries between the State and a private landowner. The trial court in the present case found that "[t]he Third Circuit

22

correctly observed that a temporary body of water that is seasonally inundated a high river stages cannot be a real lake, and therefore cannot be public property."

The trial court refused to apply *State v. Placid Oil. Co.*, 300 So.2d 154 (La.1973). In its' written reasons, the trial court stated the following:

> [I]n this court's view, *Placid Oil*, does not nor was it ever intended to apply to mere temporary bodies of water created when a river seasonally overflows its channel. In view of extensive and exhaustive research into Louisiana jurisprudence, the court is convinced that no such jurisprudence exists holding that a temporary body of water can legally be classified as a lake. Nor has any party to this litigation come forward with any such case. Thus, the court is convinced that the factors in that decision [were] intended to address permanent bodies of water – not temporary ones.

After a complete review of the record and the trial court's written reasons for judgment, we cannot say that the trial court was manifestly erroneous in finding that, in 1812, the area in contention was "a permanent river that seasonally overflowed and covered its banks."

*Right to Assert an Inverse Condemnation Claim*

*A. Stipulation Pour Autrui*

The State next argues that the trial court erred in finding that the Plaintiffs have a right to assert a takings claim against the State. Specifically, the State contends that the "Act of Assurances" between the United States and the State does not constitute a *stipulation pour autrui*. In the present case we are dealing with inverse condemnation claims.

> The action for inverse condemnation provides a procedural remedy to a property owner seeking compensation for land already taken or damaged against a governmental or private entity having the powers of eminent domain where no expropriation has commenced. The action for inverse condemnation is available in all cases where there has been a taking or damaging of property where just compensation has not been paid, without regard to whether the property is corporeal or incorporeal.

23

*State Through the Dept. of Transp. and Dev. v. Chambers Investment Co., Inc.*, 595 So2d. 598 (La.1992).

In determining this issue, the trial court relied heavily on this court's ruling in *Cooper v. Louisiana Department of Public Works*, 03-1074 (La.App. 3 Cir. 3/3/04), 870 So.2d 315, finding the facts presented in *Cooper* to be identical to the facts in the case at bar. The trial court found the third circuit's analysis in *Cooper* to be "thorough, well-reasoned, and a correct interpretation of the current state of the law."

In *Cooper*, landowners brought an action against the Louisiana Department of Transportation and Development, seeking damages for the permanent flooding of portions of their land resulting from the construction of locks and dams. *Cooper* stems from the same 1960 River and Harbor Act enacted by the United States Congress that is the basis for the present case. The Act authorized the building of the Jonesville Lock and Dam and the Columbia Lock and Dam, the purpose of which was to promote navigation along the affected rivers, the Ouachita and Black Rivers, by creating a navigational channel at least nine feet deep and one hundred feet wide. Also at issue in *Cooper* was the same 1962 "Act of Assurances" executed between the State of Louisiana and the United States of America. The United States Corps of Engineers completed the locks and dams project in 1972. Once the locks and dams became operational, it caused the "Jonesville Pool" to be formed. This pool extended approximately 107 miles upstream to the Columbia Lock and Dam. This pool has been maintained at a minimum elevation of thirty-four feet above sea level.

The plaintiffs in *Cooper* filed a lawsuit seeking damages for the permanent flooding of portions of their lands which the construction of these locks and dams along the Black and Ouachita Rivers caused. The DOTD never attempted to acquire the plaintiffs' property because it assumed that the lands were within the federal

24

navigational servitude granted to the federal government by the commerce clause of the United States Constitution. There was also no compensation paid to the plaintiffs for the taking or damaging of their land.

The "Act of Assurances" in the present case is the same Act at issue in *Cooper*. Regarding whether the "Act of Assurances" is a *stipulation pour autrui*, the *Cooper* court found:

> A stipulation made in favor of a third party beneficiary (a *stipulation pour autrui*) gives a third party the right to demand performance from the promisor. Our courts have consistently recognized the beneficiary's right to demand performance from the promisor, *directly.*
>
> Our law favors stipulations made in favor of third persons. The supreme court in *Andrepont v. Acadia Drilling Company*[, 231 So.2d 347 (La.1969)] enumerated factors for us to consider when deciding whether a contract provides a benefit for a third person:
>
> > (1) The existence of a legal relationship between the promisee and the third person involving an obligation owed by the promisee to the beneficiary which performance of the promise will discharge;
> >
> > (2) the existence of a factual relationship between the promisee and the third person, where (a) there is a possibility of future liability either personal or real on the part of the promisee to the beneficiary against which performance of the promisee [sic] will protect the former; (b) securing an advantage for the third person may beneficially affect the promisee in a material way; (c) there are ties of kinship or other circumstances indicating that a benefit by way of gratuity was intended.
>
> When we apply these factors to the facts of this case, the legal relationship between the promisee (United States) and the third persons (Plaintiffs) involves an obligation (to reimburse the Plaintiffs for the permanent flooding of their land caused by the construction and maintenance of the locks and dams along the Ouachita and Black Rivers) owed by the promisee (United States) to the beneficiaries (Plaintiffs) which performance of the promise (to "[f]urnish free of cost to the United States all lands, easements, and right of way[s], including flowage rights in overflow areas, and suitable spoil-disposal areas necessary for construction of the project and for its subsequent maintenance, when and as required" and to "[h]old and save the United

States free from damages due to construction and maintenance of the project") by the promisor (DOTD) would discharge.

In other words, the obligation that the United States imposed as a condition of the "Act of Assurances" and undertaken by the DOTD (to provide the United States with all lands and servitudes necessary for the construction and maintenance of the locks and dams along the Ouachita and Black Rivers) constitutes a *stipulation pour autrui* in favor of the Plaintiffs. The inference is clear that the United States knew before it constructed these locks and dams that it needed to acquire multiple pieces of property and servitudes to carry out this massive construction project. As such, it was interested in having the DOTD undertake its obligation to compensate the Plaintiffs if construction resulted in the taking of their lands because, otherwise, the United States would be responsible for paying their claims for reimbursement.

In addition, the relationship between the United States and the Plaintiffs was sufficient to support the inference that there was a possibility that the United States could be liable to the Plaintiffs sometime in the future, but performance of the DOTD's promise would protect the United States. This possibility of future liability (for the damaging or taking of land caused by the construction of these locks and dams) stems from the very obligation that the United States wanted discharged. Therefore, this case fits squarely within the guidelines our supreme court set for determining when claimants should receive third-party beneficiary status.

The fact that the parties did not specifically name the Plaintiffs in the "Act of Assurances" as third party beneficiaries is of no consequence because our jurisprudence recognizes that parties to a contract may make a *stipulation pour autrui* in favor of undetermined persons. Moreover, the law does not require express acceptance or consent by third party beneficiaries, nor does it require a particular form of acceptance or consent. Comment (b) to La.Civ.Code art. 1978 states that "the beneficiary's intention to accept the benefit may be made known in any manner, even implied." Thus, by simply filing suit, the Plaintiffs made known their intention to accept the benefit.

Consequently, we find that the Plaintiffs have a right to proceed directly against the DOTD for the damages arising out of the breach of its promise to the United States to provide it, free of claims, with all lands and servitudes necessary for the construction and maintenance of the locks and dams along the Ouachita and Black Rivers.

*Id.* at 330-31 (footnotes omitted).

We agree with this determination by the *Cooper* court. We find the Act of Assurances to be a *stipulation pour autrui* and that the plaintiffs enjoy a right of action against the State. We find no error in the trial court's ruling.

On appeal, the State has asserted an exception of nonjoinder, arguing that, under the nonjoinder rules found in La.Code Civ.P. art. 641,[20] the United States Army Corps of Engineers and the United States Fish and Wildlife Service are necessary parties-defendant. The State contends that their absence at the trial court renders the judgment an absolute nullity and that they must be joined for a full and just adjudication of this dispute. Having found that the Act of Assurances is a *stipulation pour autrui* and that the Plaintiffs have a direct right of action against the State for the actions of the United States, the United States is not a necessary party to this action. The State's exception of nonjoinder is denied.

*B. The Issue of Prescription*

The State assigns as error that the trial court erred in finding that prescription began to run on the Plaintiffs' takings claims when they became aware of the permanent flooding on their respective properties. The State argues that the trial court should not have applied tort doctrine to an appropriation claim. In the

---

[20] Louisiana Code of Civil Procedure Article 641 provides:

A person shall be joined as a party in the action when either:

(1) In his absence complete relief cannot be accorded among those already parties.

(2) He claims an interest relating to the subject matter of the action and is so situated that the adjudication of the action in his absence may either:

(a) As a practical matter, impair or impede his ability to protect that interest.

(b) Leave any of the persons already parties subject to a substantial risk of incurring multiple or inconsistent obligations.

alternative, the State contends that, if the application of tort doctrine is appropriate, the trial court erred in finding the basis for these claims constitutes a continuing tort.

As previously discussed, the trial court found the *Cooper* case directly on point and controlling. The State made the same argument in *Cooper* as it does in the present case, which is that the prescriptive period for takings found in La.R.S. 13:5111 applied to the plaintiffs' claims. "Specifically, it contend[ed] that the taking of property, by flooding or otherwise without proper exercise of eminent domain, is not a tort; rather, it is an appropriation by a governmental entity, subject to the three-year prescriptive period found in La.R.S. 13:5111." *Cooper* at 323. La.R.S. 13:5111 (emphasis added) provides, in pertinent part:

> A. A court of Louisiana rendering a judgment for the plaintiff, in a proceeding brought against the state of Louisiana, a parish, or municipality or other political subdivision or an agency of any of them, for compensation for the taking of property by the defendant, other than through an expropriation proceeding, shall determine and award to the plaintiff, as a part of the costs of court, such sum as will, in the opinion of the court, compensate for reasonable attorney fees actually incurred because of such proceeding. Any settlement of such claim, not reduced to judgment, shall include such reasonable attorney, engineering, and appraisal fees as are actually incurred because of such proceeding. *Actions for compensation for property taken by the state, a parish, municipality, or other political subdivision or any one of their respective agencies shall prescribe three years from the date of such taking*.

The *Cooper* court explained that prescriptive statutes must be strictly construed against prescription. *Cooper*, 870 So.2d 315. They found:

> A strict reading of La.R.S. 13:5111 leaves one no choice but to conclude that the three-year prescriptive period should only apply when it is "the state, a parish, municipality, or other political subdivision or any one of their respective agencies" taking the property. Even if we had any doubt whether this language encompassed takings by the United States, we could not alter our conclusion, given the mandate that we strictly construe ambiguous prescription statutes against prescription and in favor of the obligation sought to be extinguished

28

In *Cooper*, the court found that the record clearly showed that the United States acted under its own accord in the exercise of its power to improve navigable rivers.

> Consequently, the only entity that caused the flooding of Plaintiffs' lands is the United States. The project was solely under the direction and control of the United States and title to the lands acquired, whether by purchase or condemnation, vested in the United States. It, also, paid all constructions costs of the canal, locks and dams. Moreover, the supervision, operation and maintenance of the finished project are and have always been the sole responsibility of the United States.

Because the United States took the property, rather than the State, the *Cooper* court found La.R.S. 13:5111 inapplicable. As such, they found that the general one-year prescriptive period for delictual actions governed the plaintiffs' claims. In the present case, the United States constructed the various structures in and around the Catahoula Basin to promote navigation on the Ouachita and Black rivers. At the completion of the project, the record indicates that the United States Fish and Wildlife Service began managing water levels in and around the Catahoula Basin. The record further indicates that the United States Fish and Wildlife Service continues to manage the water levels to this day. We agree with this court's decision in *Cooper* that La.R.S. 13:5111 does not apply because the United States damaged the land. We further find that the application of tort doctrine is appropriate. We must now determine whether the theory of continuing tort should be applied.

"When damage is caused to immovable property, the one year prescription commences to run from the day the owner of the immovable acquired, or should have acquired, knowledge of the damage." La.Civ.Code art. 3493. However, under the continuing tort theory, when the cause of the injuries is continuous and leads to successive damages, prescription begins to run once the wrongful conduct ceases. *Cooper*, 870 So.2d 315. In *Cooper*, the court found that each interference with the

29

servitudes of drainage constituted a separate, continuous tort. *The Estate of Patout v. City of New Iberia*, 97-1097 (La.App. 3 Cir. 3/6/98), 708 So.2d 526, *writ granted*, 98-961 (La. 7/2/98), 721 So.2d 897, was found to be analogous, wherein "the courts held that debris and other objects placed on another's property constituted a continuing trespass (or a continuing tort) and, accordingly, prescription did not run until the trespass was abated." *Cooper* at 323. The *Cooper* court found that "[l]ikewise, prescription will not run. . . .until the flooding of Plaintiffs' lands is abated." *Id.*

The trial court in the present case opined that:

[T]he courts have looked to the alleged injury-producing conduct of the tortfeasors to determine whether that conduct was perpetuated through overt, persistent, and ongoing acts. Where the wrongful conduct was completed, but the plaintiff continued to experience injury in the absence of any further activity by the tortfeasor, no continuing tort was found. However in the instant case, the constant interference with their natural servitudes of drain by the defendant, causing the increased duration of the flooding of their lands constitutes continuing tortious conduct.

In addition to finding that each interference with the servitude of drainage constituted a continuing tort, the trial court also noted the case of *Roberson v. Lincoln Parish Police Jury*, 899 So.2d 636. In that case, the second circuit found that the plaintiffs' claim for injunctive relief had not prescribed, explaining:

In *Gaharan v. State Department of Transportation and Development,* 579 So.2d 420 (La.1991), the state constructed a bridge over a creek, raising the roadbed of the highway by two and a half feet. Construction was completed in 1978 and the property flooded in 1982, 1983, and 1987. The plaintiff filed suit seeking damages and injunctive relief in 1988. The appellate court found that the claim for damages was prescribed under La. R.S. 9:5624. However, it also found that the claim for injunction for interference with drainage was not subject to prescription.

The supreme court affirmed the holding that the claim for injunctive relief had not prescribed. The court held that under La. C.C. art. 758, prescription does not run against natural servitudes. Therefore

30

an action for injunctive relief to enforce a natural servitude does not prescribe. *Gaharan v. State Department of Transportation and Development, supra.* In *Gaharan,* the supreme court went on [to] state that, to the extent that *Nuckolls v. Louisiana State Highway Department,* 337 So.2d 313 (La.App. 2d Cir.1976), holds that actions for injunction against public bodies are prescribed under La. R.S. 9:5624, the case is overruled.

For the reasons stated above, we find that prescription has not run on Plaintiffs' claims for compensation and injunctive relief.

### C. Subsequent Purchaser Doctrine

The State next argues that the Plaintiffs cannot assert a claim for the inverse condemnation or appropriation of their property unless they owned the property at the time of the taking. The date used by the State for the taking is 1973, when the Water Management Agreement was enforced. The State contends that any Plaintiffs who purchased their property after 1973 cannot assert a claim. Only one Plaintiff acquired their property prior to 1973. "The subsequent purchaser rule is a jurisprudential rule which provides that a property owner 'has no right or actual interest in recovering from a third party for damage which was inflicted on the property before his purchase, in the absence of an assignment or subrogation of the rights belonging to the owner of the property when the damages was inflicted.'" *Grace Ranch, LLC v. BP America Production Company*, 17-1144, p. 4-5 (La.App. 3 Cir. 7/18/18), 252 So.3d 546, 550-51 (citing *Eagle Pipe & Supply, Inc. v. Amerada Hess Corp.*, 10-2268, 10-2272, 10-2275, 10-2289, p.8 (La. 10/25/11), 79 so.3d 246, 256-57). The State argues that the holding in *Eagle Pipe* precludes the Plaintiff's from asserting a claim for damages to their property. This court in *Grace Ranch* summarized the decision in *Eagle Pipe* as such:

> *Eagle Pipe* involved a suit by landowners against oil and gas production companies for damages arising from pre-purchase contamination of the property pursuant to various surface leases. The

31

supreme court reviewed Louisiana jurisprudence along with Louisiana statutory law regarding property rights and obligations as they apply to subsequent purchasers of property. The supreme court concluded that damage to property constitutes damage to a property owner's right of enjoyment in the property, which is a right of ownership and, consequently, a real right in the property. The supreme court noted that as a result, the tortfeasor becomes obligated to the owner of the property whereby the owner is granted a right to demand performance from the tortfeasor by seeking payment of damages. The supreme court further concluded that the right to sue is personal and only enforceable by the property owner against the tortfeasor. Thus, a subsequent owner of the property has no right to sue the tortfeasor for the previously inflicted damage absent an assignment or subrogation of the prior owner's personal right to sue for that damage.

*Grace Ranch, LLC*, 252 So.3d at 551 (citations omitted).

The State contends that the Plaintiffs, as subsequent purchasers of the property, have no right of action to sue the State. The trial court, however, found that *Eagle Pipe* did not apply. In *Eagle Pipe*, the supreme court explained:

The subsequent purchaser rule is a jurisprudential rule which holds that an owner of property has no right or actual interest in recovering from a third party for damage which was inflicted on the property before his purchase, in the absence of an assignment or subrogation of the rights belonging to the owner of the property when the damage was inflicted.

*Id.* at 256-57.

The trial court in the present case found that *Eagle Pipe* did not apply because this case involves a continuing tort, distinguishing it from the facts in *Eagle Pipe.* The *Eagle Pipe* court discussed the development of the subsequent purchaser rule at length. The rule has its origins in a case from 1851, *Clark v. J.L. Warner Co. et al.*, 6 La.Ann. 408 (1851). The supreme court in that case held that "'as to damages actually suffered before the purchase,' general tort principles would require that each preceding owner would have a right to recover for the damages which occurred while he or she owned the premises." *Eagle Pipe* at 263 (quoting *Clark* at 409). The supreme court ultimately found that the plaintiff Clark did not have a right of to

32

assert a claim for damages which occurred prior to his ownership of the property. Following *Clark* and its' progeny, the *Eagle Pipe* court determined that "[i]nsofar as Eagle Pipe claims a right to sue based on the damage to the property which occurred before its ownership, we hold the plaintiff has no right of action to assert as a matter of law." *Id.* at 279.

The plaintiff in *Eagle Pipe* did argue that the damage to its' property was continuing, however, the court found that the allegations found in the petition did not constitute a continuing tort. Specifically, it noted that the allegations were "not perpetuated through overt, persistent, and ongoing acts." *Id.* at 280. This is clearly distinguishable from our findings in the case at bar.

We agree with the trial court that *Eagle Pipe* is distinguishable from this case and does not apply. The damages claimed by the Plaintiffs were not only sustained prior to their purchase, rather the wrongful conduct and subsequent damages have continued to occur during the Plaintiffs' ownership of the property at issue. As such, the Plaintiffs in this matter have a right of action to assert a claim against the State. The State's Exception of No Right of Action is denied.

*Damages and Attorney's Fees*

We now turn our attention to damages and attorney's fees. The trial court ordered damages to the Lake Plaintiffs in the amount of $28,745,438.40, together with legal interest from the date of judicial demand, May 4, 2006, until paid. The trial court further ordered damages in the amount of $4,694,309.68, together with legal interest from the date of judicial demand to the Lake Plaintiffs for oil and gas royalties attributable to the mineral production from the river banks between May 2003 and the date of trial. The Swamp Plaintiffs' were awarded $9,550,800.00, together with legal interest from the date of judicial demand.

33

Regarding attorney's fees and expert fees, the trial court ruled:

IT IS FURTHER ORDERED, ADJUDGED, and DECREED that (i) the Motion for Fees and Costs is GRANTED on the issue of attorney's fees; (ii) the Plaintiffs are awarded attorney's fees in the full sum of TWENTY-TWO MILLION SEVENTY FIVE THOUSAND EIGHT HUNDRED AND FORTY THREE DOLLARS AND 82/100 ($22,075,843.82); (iii) pursuant to LA. R.S. 13:5111, there be judgment herein in favor of the Plaintiffs, and against the State, for seventy-five percent of that amount, or $16,556,882.87, together with legal interest from the date of judgment until paid, for distribution to class counsel; and (iv) pursuant to article 595 of the Louisiana Code of Civil Procedure, the remaining twenty-five percent of that amount, or $5,518,960.95, shall be assessed against the common fund for the class for distribution of class counsel.

IT IS FURTHER ORDERED, ADJUDGED, and DECREED that (i) the Motion for Fees and Costs is GRANTED on the issue of expert witness fees; (ii) the Plaintiffs are awarded expert witness fees in the full sum of THREE HUNDRED FIFTY THREE THOUSAND TWO HUNDRED AND NINETY SEVEN DOLLARS AND 34/100 ($353,297.34); (iii) there be judgment herein in favor of the Plaintiffs, and against the State, for seventy-five percent of that amount excluding Dr. Page's fee, or $262,202.53, pursuant to La. R.S. 13:5111; (iv) the remaining twenty-five percent of that amount, or $91,094.81, shall be assessed against the common fund for the class pursuant to article 595 of the Louisiana Code of Civil Procedure, and (v) legal interest shall run o n the foregoing award from the date of judgment until paid.

IT IS FURTHER ORDERED, ADJUDGED, and DECREED that (i) the Motion for Fees and Costs is GRANTED on the issue of miscellaneous costs; (ii) the Plaintiffs are awarded miscellaneous costs in the full sum of EIGHTY NINE THOUSAND SIXTY SEVEN DOLLARS AND 45/100 ($89,067.45); (iii) there be judgment herein in favor of the Plaintiffs, and against the State, for seventy-five percent of that amount, or $66,800.59, pursuant to La. R.S. 13:5111; (iv) the remaining twenty-five percent of that amount, or $22,266.86, shall be assessed against the common fund for the class pursuant to article 595 of the Louisiana Code of Civil Procedure; and (v) legal interest shall run on the forgoing award from the date of judgment until paid.

IT IS FURTHER ORDERED, ADJUDGED, and DECREED that (i) the Motion for Fees and Costs is GRANTED on the issue of provision costs for the administration of the claims process; (ii) the Plaintiffs are awarded a provisional amount for the administration of the claims process post-trial in the full sum of ONE HUNDRED SIXTY EIGHT THOUSAND DOLLARS AND 00/100 ($168,000.00); (iii) there be judgment herein in favor of the Plaintiffs, and against the State, for seventy-five percent of that amount, or $126,000.00, pursuant to La.

R.S. 13:5111; (iv) the remaining twenty-five percent of that amount, or $42,000.00, shall be assessed against the common fund for the class pursuant to article 595 of the Louisiana Code of Civil Procedure; and (v) legal interest shall run on the foregoing award from the date of judgment until paid.

IT IS FURTHER ORDERED, ADJUDGED, and DECREED that (i) the Motion for Fees and Costs is GRANTED with respect to Mr. Steve Crooks' request for an incentive award as class representative; (ii) Mr. Steve Crooks is awarded an incentive award for serving as a class representative in this case in the full sum of TEN THOUSAND DOLLARS AND 00/100 ($10,000.00); (iii) there be judgment herein in favor of Mr. Steve Crooks, and against the State, for seventy-five percent of that amount, or $7,500.00, pursuant to La. R.S. 13:5111; (iv) the remaining twenty-five percent of that amount, or $2,500.00 shall be assessed against the common fund for the class pursuant to article 595 of the Louisiana Code of Civil Procedure; and (v) legal interest shall run on the foregoing award from the date of judgment until paid.

The State argues that the trial court erred in concluding that the plaintiffs' claims had not prescribed under La.R.S. 13:5111, while awarding attorney's fees under the same statute. Louisiana Revised Statutes 13:5111(A) provides, in pertinent part:

A court of Louisiana rendering a judgment for the plaintiff, in a proceeding brought against the state of Louisiana, a parish, or municipality or other political subdivision or an agency of any of them, for compensation for the taking of property by the defendant, other than through an expropriation proceeding, shall determine and award to the plaintiff, as a part of the costs of court, such sum as will, in the opinion of the court, compensate for reasonable attorney fees actually incurred because of such proceeding. Any settlement of such claim, not reduced to judgment, shall include such reasonable attorney, engineering, and appraisal fees as are actually incurred because of such proceeding. Actions for compensation for property taken by the state, a parish, municipality, or other political subdivision or any one of their respective agencies shall prescribe three years from the date of such taking.

The plain language of the statute requires an award of attorney's fees only when a court is "rendering a judgment for the plaintiff . . . for compensation for the taking of property by the" State. We previously determined that the taking of Plaintiffs' land was committed by the United States and, as a result, La.R.S. 13:5111

35

does not apply to this case. Thus, the Plaintiffs are not entitled to attorney's fees under La.R.S. 13:5111 because we are not "rendering a judgment for the plaintiff . . . for compensation for the taking of property by the" State.

The trial court held that the remaining twenty-five percent (25%) of the total attorney's fee award ($5,518,960.95) shall qualify and be assessed against the common fund pursuant to La.Code Civ.P. art. 595. Louisiana Code of Civil Procedure Article 595 provides, in pertinent part: "The court may allow the representative parties their reasonable expenses of litigation, including attorney's fees, when as a result of the class action a fund is made available, or a recovery or compromise is had which is beneficial, to the class." Having found that the Plaintiffs are entitled to recover damages and pursuant to La.Code Civ.P. art. 595, we amend the trial court's judgment and assess 100% of the attorney's fees ordered, in the amount of $22,075,843.80, against the common fund.

For the same reasons, the trial court's judgment with respect to the incentive awarded to Steve Crooks as class representative and the provisional amount for the administration of the claims process post-trial is amended. Steve Crooks's incentive award in the amount of $10,000.00 is amended, with the award to be assessed 100% against the common fund. The award totaling $168,000.00 for the provisional amount for the administration of the claims process post-trial is amended to be assessed 100% against the common fund.

We further amend the trial court's judgment regarding the assessment of expert witness fees and miscellaneous costs. La.Code Civ.P. art. 1920 states that "costs shall be paid by the party cast" and "the court may render judgment of costs . . . against any party, as it may consider equitable." Therefore, we amend the judgment, ordering the expert witness fees in the amount of $353,297.34 to be

assessed against the State. The trial court's judgment regarding miscellaneous costs is also amended, ordering those costs in the amount of $89,067.45 to be assessed against the State.

The State also takes issue with the damages awarded by the trial court. The State first contends that the trial court awarded damages to persons not in the litigation. However, in Written Reasons dated May 16, 2016, the trial court set an amount of money which the State was to deposit into the registry of the court. The trial court went on to state that "[a]ny funds remaining after the plaintiff *class members have properly submitted proof of claims*." We find no merit to the State's contention.

Next, the State argues that the trial court should have set the boundary of the river bed in order to determine the size of the property taken. The State also contends that the trial court erred in using the 2014 value of the land instead of the 2006 value, which is the date this case was filed. At trial, Mr. Michael Mayeaux was qualified as an expert in the field of land surveying. He testified that there are approximately 22,813.84 acres in the Catahoula Basin below the GLO meander line, which comprised the total acreage of riparian lands owned by the Lake Plaintiffs. His testimony further established that there are approximately 7,580 acres of land in the Catahoula Basin below an elevation of 35 feet mean sea level. This figure constitutes the total acreage included in the overflow lands owned by the Swamp Plaintiffs. The State did not challenge Mr. Mayeux's testimony, and his opinion was uncontroverted.

Mr. Michael Copes was also qualified as an expert in the field of real estate appraisals. Mr. Copes determined that the appropriate value for the servitude of drain to be $1,260 per acre. As stated in the trial court's Written Reasons, Mr. Copes

testified that he chose to value the property rights as of 2014 "because there would be no material difference between using the 2006 values being paid in the area for Wetland Resources Program servitudes and adjusting those for inflation between 2006 and 2014, as opposed to simply using the 2014 values for the same servitudes and making no adjustment for inflation." We find no abuse of discretion in the court's determination of an award of damages.

## DECREE

For the foregoing reasons, the judgment of the trial court is affirmed in part, vacated in part, and rendered. The trial court's judgment awarding attorney's fees, costs, and fees under La.R.S. 13:5111 is vacated. It is hereby ordered that an award of attorney's fees in the amount of $22,075,843.80 be assessed against the common fund, pursuant to La.Code Civ.P. art. 595. It is hereby ordered that an award of expert witness fees in the amount of $353,297.34 be rendered against the State. It is hereby ordered that an award of miscellaneous costs in the amount of $89,067.45 be rendered against the State. It is hereby ordered that a provisional amount for the administration of the claims process post-trial in the amount of $168,000.00 be assessed against the common fund, pursuant to La.Code Civ.P. art. 595. It is hereby ordered that Steve Crooks receive an incentive award as class representative in the amount of $10,000.00, assessed against the common fund, pursuant to La.Code Civ.P. art. 595. The trial court's judgment is affirmed in all other respects. The State's exceptions of lack of subject matter jurisdiction, no right of action, nonjoinder, and acquisitive prescription filed on appeal are Denied.

**AFFIRMED IN PART; VACATED IN PART; AND RENDERED.**

NUMBER 17-750

COURT OF APPEAL, THIRD CIRCUIT

STATE OF LOUISIANA

STEVE CROOKS AND ERA LEA CROOKS

VERSUS

STATE OF LOUISIANA, DEPARTMENT OF NATURAL RESOURCES

AMY, J., dissenting.

In my opinion, even in light of the parties' stipulation regarding the Swamp Plaintiffs' ownership and if one accepts that the trial court was not manifestly erroneous in its conclusion regarding the classification of the area known as Catahoula Lake and the Lake Plaintiffs' ownership, prescriptive rules dictate a reversal in this matter. Chiefly, I find that the Plaintiffs' claims for compensation for inverse condemnation are barred by liberative prescription. Further, I believe that the Lake Plaintiffs lost any claim to ownership of the land by virtue of thirty-year acquisitive prescription.

In written reasons for judgment, the trial court provided an excerpt from a 1936 publication by the Department of Conservation, Louisiana Geological Society, which is titled "Geology of Catahoula and Concordia Parishes," and quoted it as follows:

> At times of high water considerable areas are inundated by "backwater" not caused by overflow of levees. A considerable area of southern Concordia and Catahoula Parishes is so inundated every year. When the Mississippi or the Red is high, water is backed up the Black, Ouachita, Tensas, and Little Rivers, and flows backward through bayou openings into the adjoining lowlands. Catahoula Lake, normally dry, becomes a lake, and thousands of acres are covered from 1 to several feet deep. As the river stages are lowered, this water drains through bayous back into the rivers, and land is again available for pasturing of cattle and hogs. Very little of this black land is cultivated, except along the margins where late crops are sometimes harvested.

Prior to this lawsuit, the record indicates that the area known as Catahoula Lake was treated as if it were a lake, and thus, as State-owned land. Additionally, in *Sanders v. State, Dep't of Natural Res.*, 07-821, p. 1 (La.App. 3 Cir. 12/19/07), 973 So.2d 879, 879, *writ denied*, 08-0438 (La. 4/18/08), 978 So.2d 352, a landowner "asked that a boundary be established between his land and the land owned by the State, as owner of the bed of Catahoula Lake and/or Little River." In its discussion, a panel of this court stated: "No one disputes the trial court's finding that Catahoula Lake is a lake, and it was stipulated at trial that it was navigable in 1812. . . . [T]he proper determination of the State's ownership is the ordinary high water mark." *Id.* at 882. Nonetheless, as mentioned above, even if one now accepts that the trial court was not manifestly erroneous in its conclusion regarding the classification of the area known as Catahoula Lake and the Lake Plaintiffs' ownership of the land, prescriptive rules require a reversal in this matter.

Initially, I find that La.R.S. 13:5111 bars the Plaintiffs' claims for compensation. Here, the Plaintiffs seek compensation for the increased water on their property that has resulted from the project. As this court explained in *Hawthorne v. La. Dep't of Pub. Works*, 540 So.2d 1261, 1262 (La.App. 3 Cir.), *writ denied*, 544 So.2d 406 (La.1989), "[t]he taking of property, by flooding or otherwise, without proper exercise of eminent domain, . . . is considered an appropriation." *See also Cooper v. La. Dep't of Pub. Works*, 540 So.2d 1265 (La.App. 3 Cir. 1989) (hereinafter "*Cooper* I"). Concerning appropriations, La.R.S. 13:5111 provides, in pertinent part: "Actions for compensation for property taken by the state, a parish, municipality, or other political subdivision or any one of their respective agencies shall prescribe three years from the date of such taking." Under La.R.S. 13:5111, prescription begins to run when the claimant is aware of those facts which give rise to a cause of action. *Hawthorne*, 540 So.2d 1261. Based on the record in this case, the Plaintiffs or their ancestors in title were

2

aware or should have been aware of the increased inundation of their lands no later than 1973 when the water level failed to seasonally subside as it had done in the past. I note that La.R.S. 13:5111 was not passed until 1975. *See* 1975 La. Acts No. 434, § 1. Regardless, because the Plaintiffs did not file their petition until May 4, 2006, which was more than thirty years after the passage of La.R.S. 13:5111, their claims for compensation had prescribed by the time they filed their petition. *See Hawthorne*, 540 So.2d 1261 (holding that the landowner's claim for compensation for a taking that occurred in 1972 was prescribed under La.R.S. 13:5111 because the landowner did not file suit until 1981). *See also Cooper* I, 540 So.2d 1265.

In asserting that their claims for compensation are not barred by liberative prescription, particularly La.R.S. 13:5111, the Plaintiffs base their argument, in part, upon the case of *Cooper v. La. Dep't of Pub. Works*, 03-1074 (La.App. 3 Cir. 3/3/04), 870 So.2d 315 (hereinafter "*Cooper* II"). In that case, landowners filed suit against the Louisiana Department of Public Works seeking compensation for the permanent flooding of portions of their land resulting from the same project at issue in the case at hand. The court characterized the landowners' claims as being based upon "the permanent flooding of portions of their lands which the impingement of their servitude of drainage caused" and determined that "any interference with a servitude is a violation of [Louisiana Civil Code] Article 667 which gives rise to a delictual action that prescribes in one year." *Id.* at 321, 322. Though the parties stipulated that the landowners were aware of the inundation beginning in 1972 and suit was not filed until 1994, the panel concluded that the landowners' claims had not prescribed according to the continuing tort doctrine, stating:

> [I]f the operating cause of injury is tortious and continually gives rise
> to successive damages, prescription begins to run from the cessation
> of the particular wrongful conduct causing the damage. "A continuing

3

> tort is occasioned by unlawful acts, not the continuation of the ill effects of an original, wrongful act."
>
> In this matter, because each instance of damage (each interference with the servitudes of drainage) constitutes a tort under Article 667 and given Plaintiffs' belief that, both, the damage and interference are continuous, Plaintiffs assert that each of these torts qualifies as a continuing tort. We agree.
>
> . . . .
>
> [P]rescription will not run in this case until the flooding of Plaintiffs' lands is abated. Therefore, we find, through application of the continuing tort theory, that prescription has not, yet, begun to run on their claims for compensation.

*Id.* at 322-23 (footnotes omitted). The court further reasoned that La.R.S. 13:5111 was inapplicable because the United States, not the State of Louisiana, had appropriated the landowners' property.

Although I recognize that the case concerns similar claims and the same project at issue herein, I find the analysis in *Cooper* II, 870 So.2d 315, ultimately unhelpful in the present matter. In my opinion, the *Cooper* II majority erred in applying tort doctrine to an appropriation claim and in finding that the United States, not the State, was the entity responsible for appropriating the landowners' property. In applying the continuing tort doctrine, the *Cooper* II majority broke from longstanding precedent in which this court has held that "[t]he taking of property, by flooding or otherwise, without proper exercise of eminent domain, *is not a tort* but is considered an appropriation." *Hawthorne*, 540 So.2d at 1262 (emphasis added) (citing *Bernard v. State, Dep't of Pub. Works*, 127 So.2d 774 (La.App. 3 Cir. 1961); *Boothe v. Dep't of Pub. Works*, 370 So.2d 1282 (La.App. 3 Cir.), *writ denied*, 374 So.2d 661 (La.1979)). *See also Cooper* I, 540 So.2d 1265. I also note that in *Hawthorne*, 540 So.2d 1261, and in *Cooper* I, 540 So.2d 1265, the claims for compensation, which a panel of this court concluded had prescribed under La.R.S. 13:5111, were based on the same project at issue in *Cooper* II and in the present case.

Further, I disagree with the reasoning in *Cooper* II, 870 So.2d 315, that, if an appropriation occurred, the United States, not the State, is the entity responsible for the appropriation of the Plaintiffs' land. For example, in *Succession of Rovira v. Bd. of Comm'rs of Port of New Orleans*, 418 So.2d 1382 (La.App. 4 Cir.), *writ denied*, 423 So.2d 1147 (La.1982), the State agreed to furnish, free of cost to the United States, all lands, easements, rights-of-way, and spoil disposal areas for the construction of the Mississippi River Gulf Outlet (MRGO) and delegated this task to a local entity, the Dock Board. A portion of the plaintiffs' private property was occupied and used for the channel of the MRGO, but there had been neither expropriation proceedings nor compensation paid to the plaintiffs. *Id.* The plaintiffs sued the Dock Board, and, in concluding that the United States was not an indispensable party, the fourth circuit stated, in pertinent part:

> It is clear from the documents ordering and empowering the Dock Board to acquire the rights-of-way that the Dock Board is the public body that was the "taker" of the land used in construction. The instant suit is a claim for compensation for the lands taken. The dispute is between plaintiffs and the Dock Board as "taker". It is of no moment that the United States, as ultimate recipient of the lands taken, constructed the waterway and now operates it. It is the Dock Board, not the United States, that must respond to the claim asserted by plaintiffs.
>
> . . . .
>
> In our case, plaintiffs' claim is not for property damage occasioned by construction, but for compensation for the "taking" of the property.

*Id.* at 1386-87. Likewise, in this case, if one acknowledges the parties' stipulation regarding the Swamp Plaintiffs' ownership and accepts that the trial court was not manifestly erroneous in its conclusion concerning the Lake Plaintiffs' ownership, then the Plaintiffs' property was taken without expropriation proceedings or compensation paid to them. As the case is framed, the Plaintiffs seek compensation for the taking of their property, not for damage occasioned by

5

construction of the project, so the dispute is between the Plaintiffs and the State as the "taker" of the land used for the project.

Thus, I conclude that the Plaintiffs' claims for compensation in this case should be governed by the prescriptive period in La.R.S. 13:5111 and properly resolved by reference to *Hawthorne*, 540 So.2d 1261; *Cooper I*, 540 So.2d 1265; and *Succession of Rovira*, 418 So.2d 1382. In my opinion, the analysis in *Cooper II*, 870 So.2d 315, should not be further applied by this court. I find that application of the continuing tort doctrine in this situation, as opposed to La.R.S. 13:5111, contravenes the rule that "is well settled under Louisiana law that when conflicting statutes are applicable, the one more specifically directed to the matter applies." *Avenal v. State*, 03-3521, p. 33 (La. 10/19/04), 886 So.2d 1085, 1108 n.29 (citing *Estate of Patout v. City of New Iberia*, 98-0961 (La. 7/7/99), 738 So.2d 544), *cert. denied*, 544 U.S. 1049, 125 S.Ct. 2305 (5/23/05).

Having concluded in my analysis that the Plaintiffs' claims for compensation have prescribed according to La.R.S. 13:5111, the issue of the Lake Plaintiffs' ownership of the area known as Catahoula Lake remains. On appeal, the State filed an exception of prescription, asserting ownership by thirty-year acquisitive prescription. The Lake Plaintiffs rely on La.Const. art. 1, § 4(B), and La.Const. art. 6, § 23 and cases interpreting it, in opposition.

I first address the Lake Plaintiffs' argument regarding La.Const. art. 6, § 23. Louisiana Constitution Article 6, § 23, which is titled "Acquisition of Property," provides: "Subject to and not inconsistent with this constitution and subject to restrictions provided by general law, *political subdivisions* may acquire property for any public purpose by purchase, donation, expropriation, exchange, or otherwise." (Emphasis added). As emphasized, I note that the plain language of the article indicates that it applies to political subdivisions of the State, not the State itself.

Further, in interpreting La.Const. art. 6, § 23, the supreme court has stated:

First, construing Section 23's "or otherwise" language as granting political subdivisions the authority to acquire property through acquisitive prescription would render La. Const. Art. VI, Sect. 24 superfluous.[1] This is so because Section 23 broadly authorizes a political subdivision to acquire "*property*" through the enumerated means, "or otherwise." The jurisprudence of this state has long recognized the term "property" includes recognized dismemberments of ownership rights in a thing as well as full ownership of the thing. See, *Columbia Gulf Transmission Co. v. Hoyt*, 252 La. 921, 215 So.2d 114, 120 (1968). A servitude is one of these recognized dismemberments of ownership rights. See, *Humble Pipe Line Co. v. Wm. T. Burton Industries, Inc.*, 253 La. 166, 217 So.2d 188, 192 (1968) ("An easement is, however, property or an interest in land.") (Quoting 25 Am.Jur.2d Easements and Licenses, § 2, p. 417-18). Thus, Section 23 authorizes a political subdivision to acquire, through any of the listed methods, not only full ownership rights, but also servitudes. Accepting the Parish's contention, that Section 23's "or otherwise" language includes authorization for governmental subdivisions to acquire through *acquisitive prescription*, we would necessarily be led to the conclusion that Section 23 authorizes political subdivisions to acquire servitudes through acquisitive prescription. It is readily apparent that this was not the intent of Section 23, however, because Section 24 is directed solely to granting governmental subdivisions the limited authority *to acquire servitudes through acquisitive prescription*. Thus, interpreting Section 23 as granting political subdivisions the authority to acquire through acquisitive prescription would render Section 24 nugatory, a result incongruous with the rules of interpretation of our constitution. See, e.g., *State ex rel. Guste v. Bd. of Commissioners of the Orleans Levee Dist.*, 456 So.2d 605 (La.1984).

Second, in addition to the absurd consequence which would result from the Parish's proposed interpretation of Article VI, Sect. 23, we further note that Section 24 is dedicated entirely to a governmental subdivision's authority to acquire by prescription. The constitutional framers' dedication of an entire section to the matter of acquisitive prescription reflects the importance which they believed it deserved. It would be inconsistent with the framers' unreserved treatment of this matter *with respect to servitudes*, to conclude the framers' simple inclusion of the omnibus words "or otherwise" in Article VI, Sect. 23 were intended to authorize a political subdivision's acquisition of *full ownership* of immovable property through acquisitive prescription.

Finally, Article VI, Sect. 24's express recognition that acquisitive prescription should run in favor of political subdivisions *with respect to servitudes* reflects the constitutional framers' consideration of the possibility of a political subdivision obtaining

---

[1] Louisiana Constitution Article 6, § 24 provides: "The public, represented by local governmental subdivisions, may acquire servitudes of way by prescription in the manner prescribed by law."

7

property through acquisitive prescription. Despite their consideration of this possibility, the framers refrained from granting political subdivisions this right with respect to acquisition of full ownership of property. We can only conclude that this was a deliberate omission on the part of the framers.

. . . .

Based on the foregoing, we believe it would be incorrect to conclude the constitutional framers, by the inclusion of the words "or otherwise" in Article VI, Sect. 23, intended to allow political subdivisions to acquire full ownership of property through acquisitive prescription.

*Parish of Jefferson v. Bonnabel Props., Inc.*, 620 So.2d 1168, 1170-71 (La.1993) (footnote omitted). *See also Roy v. Belt*, 03-1022 (La.App. 3 Cir. 2/18/04), 868 So.2d 209, *writ denied*, 04-1149 (La. 7/2/04), 877 So.2d 147; and *King's Farm, Inc. v. Concordia Parish Police Jury*, 97-1056 (La.App. 3 Cir. 3/6/98), 709 So.2d 953, *writ denied*, 98-1450 (La. 9/18/98), 724 So.2d 748. Though these cases do not provide an express legislative or constitutional pronouncement regarding a political subdivision's ability or inability to acquire land by acquisitive prescription, the Lake Plaintiffs have correctly pointed out that the courts have held that political subdivisions cannot acquire land in that manner under the "or otherwise" language of La.Const. art. 6, § 23.

However, even though, in the above referenced cases, courts have held that political subdivisions of the State cannot acquire land by acquisitive prescription under La.Const. art. 6, § 23, in my opinion the question remains whether the State itself may acquire property by acquisitive prescription. In *Lincoln Parish Sch. Bd. v. Ruston Coll.*, 162 So.2d 419, 426 (La.App. 2 Cir.), *writ denied*, 246 La. 355, 164 So.2d 354 (La.1964), the second circuit explained:

The words 'mere possessor,' as embodied in LSA-C.C. Art. 3458,[2] embrace the State and include all natural and artificial persons, such as

---

[2] Prior to an amendment (*see* 1982 La. Acts No. 187, § 1), La.Civ.Code art. 3458 provided: "The prescription by which the ownership of property is acquired, is a right by which a mere possessor acquires the ownership of a thing which he possesses by the continuance of his possession during the time fixed by law."

individuals, corporations, bodies, corporate, and all other legal entities. No restriction or prohibition is directed against either. The constitutional provision relative to prescription as applies to the State prohibits the running of prescription against the State.

LSA-Constitution, Art. 19, s 16.[3] There is no prohibition in the organic law prohibiting the running of prescription in favor of the State or in favor of political corporations.

If public bodies or political corporations were prohibited from acquiring by prescription, such defects as may exist in a title to property acquired by purchase or donation could never be cured by possession of any nature, extent, and duration whatsoever. Such a conclusion would be contrary to sound reason and logic . . .

As heretofore observed, prescription cannot run against the State. Nevertheless, in the absence of any express provision in the Constitution and Statutes authorizing the State to avail itself of the benefits of prescription acquirendi causa, it has been firmly recognized that such prescription does run in favor of the State. In Housing Authority of New Orleans v. Banks, 224 La. 172, 69 So.2d 5, 8, the court stated:

> 'The self evident truth is that the sovereign can prescribe against, but prescription cannot run against the State. Article XIX, s 16, La.Const. of 1921.'

A similar terse statement is made in Ward et al. v. South Coast Corporation et al., 198 La. 433, 3 So.2d 689, 692:

> 'Prescription runs in favor of the state. Quaker Realty Co., Ltd., v. Purcell, 134 La. 1022, 64 So. 894; Norgress v. E. B. & S. P. Schwing, 128 La. 1040, 1043, 55 So. 667.'

While the cases quoted relate to tax sales and proceedings, no distinction is observed in the principle of acquiring by prescription.

*Lincoln Parish Sch. Bd.*, 162 So.2d 419, was decided based on the Louisiana Constitution of 1921. At the time the case was decided, La.Const. art. 1, § 2 (1921) provided: "No person shall be deprived of life, liberty or property, except by due process of law. Except as otherwise provided in this Constitution, private property shall not be taken or damaged except for public purposes and after just and adequate compensation is paid." Here, the Lake Plaintiffs have alleged that

---

[3] Louisiana Constitution of 1921 Article 19, § 16 provided: "Prescription shall not run against the State in any civil matter, unless otherwise provided in this Constitution or expressly by law." An identical provision is found in the Louisiana Constitution of 1974. *See* La.Const. art. 12, § 13.

9

the State is prohibited by the Louisiana Constitution of 1974 from acquiring private property through acquisitive prescription, specifically La.Const. art. 1, § 4, which provides, in pertinent part:

> (A) Every person has the right to acquire, own, control, use, enjoy, protect, and dispose of private property. This right is subject to reasonable statutory restrictions and the reasonable exercise of the police power.
>
> (B)(1) Property shall not be taken or damaged by the state or its political subdivisions except for public purposes and with just compensation paid to the owner or into court for his benefit. Except as specifically authorized by Article VI, Section 21 of this Constitution property shall not be taken or damaged by the state or its political subdivisions: (a) for predominant use by any private person or entity; or (b) for transfer of ownership to any private person or entity.

In my view, the language of La.Const. art. 1, § 4 ("Property shall not be taken or damaged by the state or its political subdivisions except for public purposes and with just compensation paid to the owner or into court for his benefit.") is substantially similar to that of La.Const. art. 1, §2 (1921) ("Except as otherwise provided in this Constitution, private property shall not be taken or damaged except for public purposes and after just and adequate compensation is paid."). Although *Lincoln Parish Sch. Bd.*, 162 So.2d 419, was decided under La.Const. art. 1, §2 (1921), the reasoning of that case seems applicable to La.Const. art. 1, § 4. In fact, after the enactment of the Louisiana Constitution of 1974, the supreme court cited with approval to *Lincoln Parish Sch. Bd.* when observing "that unlike a private litigant, the state may derive title or ownership not simply by acquisition from a previous owner *and/or by prescription* but, as well, in other ways, not the least of which is the ownership of lands at the state's inception." *Todd v. State, Dep't of Natural Res.*, 456 So.2d 1340, 1352 (La.1983) (emphasis added) (footnote omitted), *amended by* 474 So.2d 430 (La.1985).

Louisiana Civil Code Article 1 provides: "The sources of law are legislation and custom." In my opinion, legislation and custom favor the State being able to

10

acquire property by acquisitive prescription. I note that acquisitive prescription is the general rule of law, and the Lake Plaintiffs have not pointed to an express provision in the Louisiana Constitution, statutes, or caselaw excepting the State from the ability to derive ownership by acquisitive prescription. Though La.Const. art. 1, § 4(A) provides "[e]very person has the right to acquire, own, control, use, enjoy, protect, and dispose of private property[,]" the article also states that "[t]his right is subject to reasonable statutory restrictions[,]" and I believe that the general rule of law of acquisitive prescription is such a restriction. Moreover, I note that the laws of the State provide safeguards to protect an individual's right to property. As discussed above, La.R.S. 13:5111 provides a three year prescriptive period for a landowner to bring a claim for compensation for the taking of property by the State. Additionally, a landowner can bring an action to assert ownership for a period of thirty years before the State can obtain ownership of the property by virtue of acquisitive prescription.

I also find the State has proven the elements of thirty-year acquisitive prescription concerning the area known as Catahoula Lake. According to La.Civ.Code art. 3446, "[a]cquisitive prescription is a mode of acquiring ownership or other real rights by possession for a period of time." In order "[t]o acquire possession, one must intend to possess as owner and must take corporeal possession of the thing." La.Civ.Code art. 3424. Louisiana Civil Code Article 3486 states that "[o]wnership and other real rights in immovables may be acquired by the prescription of thirty years without the need of just title or possession in good faith." The party pleading acquisitive prescription bears the burden of proving the facts that are essential to support it by a preponderance of the evidence. *Delacroix Corp. v. Perez*, 98-2447 (La.App. 4 Cir. 11/8/00), 794 So.2d 862, *writ denied*, 00-3245 (La. 1/26/01), 782 So.2d 635; *Crowell Land & Mineral Corp. v. Funderburk,* 96-1123 (La.App. 3 Cir. 3/5/97), 692 So.2d 535. In particular, the

party must plead acquisitive prescription concerning a thing that is susceptible of acquisition by prescription. *See Chauvin v. Shell Oil Co.*, 16-609 (La.App. 5 Cir. 10/25/17), 231 So.3d 903, *writ denied*, 17-1985 (La. 1/29/18), 233 So.3d 607. The party must also prove "continuous, uninterrupted, peaceable, public, and unequivocal" corporeal possession for thirty years. La.Civ.Code art. 3476. *See also Mistric v. Kurtz*, 610 So.2d 226 (La.App. 3 Cir. 1992), *writ denied*, 612 So.2d 102 (La.1993). I consider each of the requirements in turn.

According to La.Civ.Code art. 456, "[t]he banks of navigable rivers or streams are private things that are subject to public use." Further, La.Civ.Code art. 3485 provides that "[a]ll private things are susceptible of prescription unless prescription is excluded by legislation." Thus, if one accepts that the trial court was not manifestly erroneous in its conclusion that the area known as Catahoula Lake constitutes the river banks of Little River, La.Civ.Code arts. 456 and 3485 indicate that the area known as Catahoula Lake is a private thing susceptible of prescription. Moreover, the Lake Plaintiffs have not cited legislation that excludes the area known as Catahoula Lake from prescription. Therefore, accepting the trial court's factual findings and that framing of the applicable codal law, the area known as Catahoula Lake is a private thing susceptible of acquisition by prescription.

For purposes of determining acquisitive prescription, possession can be established by precarious possession, which is "[t]he exercise of possession over a thing with the permission of or on behalf of the owner or possessor[.]" La.Civ.Code art. 3437. *See also Chauvin*, 231 So.3d 903. For example, in *Chauvin*, the fifth circuit concluded that Shell Oil's possession of the property in question had been exercised by the precarious possession of entities to whom Shell Oil had granted servitudes over the property for a period of more than thirty years. Similarly, in the present case, the State granted permission to the United States

12

Fish and Wildlife Service to manage the water levels in the area known as Catahoula Lake in the Catahoula Lake Water Level Management Agreement. The record indicates that the United States Fish and Wildlife Service began seasonally inundating and dewatering the area in 1972 according to the guidelines in the Water Level Management Agreement and continues to do so to the present day. Thus, the State's possession of the property has been exercised in this manner through the precarious possession of the United States Fish and Wildlife Service since 1972. As of the date the Lake Plaintiffs filed their lawsuit, May 4, 2006, the State had certainly been in possession of the property for more than thirty years.

Regarding whether possession is continuous or discontinuous, La.Civ.Code art. 3436 provides that possession is "discontinuous when it is not exercised at regular intervals[.]" The record indicates that possession has been continuous in this case because, as discussed above, each year since 1972, the United States Fish and Wildlife Service has managed the water levels of the area known as Catahoula Lake based on the Water Level Management Agreement. Concerning whether possession has been uninterrupted or interrupted, the supreme court explained in *Liner v. La. Land & Exploration Co.*, 319 So.2d 766, 780 (La.1975), that "[p]ossession is interrupted when possession is lost." Louisiana Civil Code Article 3433 further explains that "[p]ossession is lost when the possessor manifests his intention to abandon it or when he is evicted by another by force or usurpation." Here, the record indicates that the State's possession has been uninterrupted as there is no evidence indicating that the State manifested an intention to abandon the area or that the State was evicted from the area during the thirty-year period beginning in 1972.

Further, the record indicates that the State's possession has been peaceable, there is no evidence to suggest otherwise, and the State's possession has also been public having been made conspicuous with the presence of more water on the lands

13

in question for longer periods of time. *See* La.Civ.Code art. 3436. Concerning whether possession is unequivocal or equivocal, La.Civ.Code art. 3436 states that possession is "equivocal when there is ambiguity as to the intent of the possessor to own the thing." Here, the clarity of the State's intent to own the property is evidenced by the State granting access to the United States to raise and lower the level of State-owned waters over the property, as well as by granting mineral leases and exercising jurisdiction of the Louisiana Department of Wildlife and Fisheries over the subject property.

Louisiana Civil Code Article 3425 guides the determination of whether the State's possession has been corporeal by defining corporeal possession as "the exercise of physical acts of use, detention, or enjoyment over a thing." The corporeal possession must include such external signs of possession as to indicate that the possessor holds control and dominion over the property. *Downs v. McNeal*, 193 So.2d 843 (La.App. 3 Cir. 1967). According to *Liner*, 319 So.2d 766, the degree of corporeal possession required in a particular case depends upon the nature of the land and the use to which it is put; thus, whether activities constitute corporeal possession is a question of fact governed by the circumstances of the case. The jurisprudence further holds that when a party claims by corporeal possession alone and without title, he must show an adverse possession within enclosures. *Norton v. Addie*, 337 So.2d 432 (La.1976). In *Chevron U.S.A. Inc. v. Landry*, 558 So.2d 242, 244 (La.1990) (quoting *Hill v. Richey*, 221 La. 402, 421, 59 So.2d 434, 440 (1952)), the supreme court explained the meaning of enclosures as follows:

> "What the court means by 'enclosures', as that term is used in the numerous cases found in the jurisprudence, is that the land actually, physically, and corporeally possessed by one as owner must be established with certainty, whether by natural or by artificial marks; that is, that they must be sufficient to give definite notice to the public and all the world of the character and extent of

14

> the possession, to identify fully the property possessed, and to fix with certainty the boundaries or limits thereof...."

*See also Ricko Constr., Inc. v. Dubois*, 10-1062 (La.App. 3 Cir. 2/9/11), 57 So.3d 564.

Turning again to the facts of the case, the record indicates that the disputed property is within a tract of wetland. Based on the nature of the property involved, the inundation and dewatering of the area known as Catahoula Lake is sufficient to constitute corporeal possession over the property. *See* La.Civ.Code art. 3425. *See, e.g., O'Brien v. Alcus Lands P'ship Trust*, 577 So.2d 1094 (La.App. 1 Cir. 1991). Regarding whether the State's possession has been within enclosures, the record indicates that the project and the water management activities hold water on the subject property between the ordinary low stage of Little River up to the thirty-six (36) feet mean sea level contour. Thus, the State has satisfied the requirement of establishing corporeal possession within enclosures up to and including the thirty-six feet (36) mean sea level contour. *See Ricko Constr., Inc.*, 57 So.3d 564. Accordingly, the State has established the requirements of acquiring property by thirty-year acquisitive prescription.

In sum, I conclude that the Plaintiffs' claims for compensation for the appropriation of their property have prescribed under La.R.S. 13:5111. Further, in my opinion, the State has demonstrated ownership of the area known as Catahoula Lake by virtue of thirty-year acquisitive prescription. I find that the record warrants reversing the judgment of the trial court; sustaining the State's exceptions of liberative and acquisitive prescription; dismissing the Plaintiffs' demands for compensation and related relief, as well as dismissing the Lake Plaintiffs' demands for recognition of ownership; rendering judgment on the State's reconventional demand by recognizing the State's ownership of the area known as Catahoula Lake; and remanding with instructions to set the boundary between the Lake

15

Plaintiffs' land and the State's land at the thirty-six (36) feet mean sea level contour. For these reasons, I respectfully dissent.